**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

EAST END ERUV ASSOCIATION, INC.,
DEBORAH POLLACK and SIMCHA POLLACK,

                    Plaintiffs,

          - against -

THE TOWN OF SOUTHAMPTON and THE
TOWN OF SOUTHAMPTON ZONING BOARD
OF APPEALS,

                    Defendants.
-----------------------------------------------------------X

**MEMORANDUM AND ORDER**

**CV 13-4810 (AKT)**

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

## I.    PRELIMINARY STATEMENT

      This case is one of three related actions[1] which, at their essence, involve the efforts of

certain Jewish residents on the East End of Long Island to establish an eruv -- an unbroken

delineation of an area -- which would allow members of the Jewish faith with certain religious

beliefs to carry or push objects from place to place within the area during the Sabbath and on

Yom Kippur.  Compl. ¶ 2.  The demarcation of the eruv may be created by using telephone

poles, utility poles, wires, and existing boundaries, and by attaching wooden or plastic strips

known as "lechis" to the sides of the poles.  *Id.* ¶ 26.  Plaintiffs East End Eruv Association, Inc.

("EEEA"), Deborah Pollack and Simcha Pollack (collectively, "Plaintiffs") seek to have the

lechis placed within defendant the Town of Southampton ("Southampton") to eventually become

---

[1]      The other two actions are *East End Eruv, et al. v. Vill. of Westhampton Beach, et al.*, No. CV 11-213 and *Verizon New York Inc., et al. v. The Village of Westahmpton Beach, et al.*, No. CV 11-252.

part of a larger eruv that also encompasses the Village of Westhampton Beach ("Westhampton Beach") and parts of the Village of Quogue ("Quogue") (collectively, the "Municipalities"). *Id.*

Plaintiffs allege that defendants Southampton and the Town of Southampton Zoning Board of Appeals ("ZBA") (collectively, "Defendants") have unlawfully prevented Plaintiffs from establishing an eruv "[a]t every opportunity." *Id.* ¶ 5. Before the Court is Defendants' motion to dismiss the Complaint. DE 38. Based upon my review of the Complaint, the arguments advanced by both parties in their written submissions, as well as the applicable case law, Defendants' motion to dismiss is GRANTED to the extent that Plaintiff's Sixth Cause of Action is dismissed, without prejudice, and the remainder of the action is STAYED pending resolution of the Sixth Cause of Action in state court.

## II.    BACKGROUND

The following information is taken from the Complaint and the parties' written submissions. All facts alleged by the Plaintiffs are assumed to be true for purposes of this motion and are construed in a light most favorable to the Plaintiffs as the non-moving parties. *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009); *Matthews v. City of New York*, 889 F. Supp. 2d 418 (E.D.N.Y. 2012).

### A.    The Alleged Hardships Imposed in the Absence of an Eruv

Plaintiff EEEA is a not-for-profit corporation formed for the purpose of coordinating efforts toward the promotion and construction of an eruv in certain parts of Suffolk County. Compl. ¶ 23. Plaintiffs Deborah and Simcha Pollack are individuals residing in Southampton who live one mile away from the synagogue in Westhampton Beach. *Id.* ¶¶ 20-21, 32. Deborah Pollack's elderly mother is too weak to walk to the synagogue, or anywhere outside Deborah Pollack's home when she visits, without a wheelchair. *Id.* ¶ 32. Because there is no eruv,

Deborah Pollack cannot push her mother to synagogue, and her mother must therefore remain home on the Sabbath and Yom Kippur.  *Id.*  According to the Complaint, the inability of Deborah Pollack's mother to attend synagogue on Yom Kippur is especially painful since she cannot participate in the traditional memorial ("Yizkor") service for her late husband.  *Id.* Similarly, Plaintiff Simcha Pollack cannot push his elderly father to the synagogue in his wheelchair.  *Id.*  Because he cannot attend a synagogue, Mr. Pollack's father -- who is an ordained rabbi -- refuses to spend the Sabbath or Yom Kippur with Mr. Pollack.  *Id.*

The Complaint offers many examples of the hardships imposed on certain observant Jewish residents of the Municipalities in the absence of an eruv.  For example, Plaintiffs and other observant Jewish residents of the Municipalities cannot carry prayer books, keys, identification, and other necessary items to synagogue, neighbors' homes, or public meeting and recreational areas on the Sabbath and Yom Kippur because their sincerely-held religious beliefs preclude them from carrying anything in the public domain without an eruv.  *Id.* ¶ 33.  In addition, because certain observant Jewish residents are not permitted to push a stroller on the Sabbath and Yom Kippur, they must stay home if they have children too young to walk to the synagogue.  *Id.* ¶¶ 34-35.

The Complaint notes that a multitude of eruvin have been established nationwide and worldwide.  *Id.* ¶ 39.  In fact, the first eruv in the United States was established in 1894 in the city of St. Louis, Missouri.  *Id.*  Since then, at least twenty-eight out of the fifty states now contain one or more municipalities with an eruv.  *Id.*

**B.    Plaintiffs Seek to Establish an Eruv in the Municipalities**

In 2010, EEEA members approached Verizon New York, Inc. ("Verizon") and Long Island Lighting Company d/b/a/ LIPA ("LIPA") and requested permission to affix lechis to utility and telephone poles owned by Verizon and LIPA in order to complete the eruv, which would encompass Westhampton Beach and parts of Southampton and Quogue. *Id.* ¶ 60. Verizon and LIPA agreed to grant permission. *Id.* In or about May 2010, EEEA and Verizon entered into an Eruv-Lechi Stave Agreement, which was fully executed on August 16, 2010. *Id.* Pursuant to this Agreement, Verizon agreed to allow EEEA to affix lechis to Verizon's poles to complete an eruv. *Id.* ¶ 61. On or about July 27, 2010, EEEA and LIPA entered into a License Agreement, whereby LIPA agreed to allow EEEA to affix lechis to LIPA's poles to complete an eruv. *Id.* ¶ 62.

After entering into these agreements with Verizon and LIPA, Plaintiffs decided to slightly expand the boundaries of the eruv, and subsequently determined through their rabbinical sources that the attachment of longer lechis than they had originally anticipated would be necessary. *Id.* ¶ 63. Verizon therefore required EEEA to enter into a new standard contract which required the longer lechis to be made of 5/8-inch wide PVC. *Id.* On or about June 13, 2011, EEEA and Verizon entered into an updated Pole Attachment Agreement For Miscellaneous Attachments in order to provide for the attachment of 5/8" half-round PVC lechis to Verizon's utility poles within the Municipalities. *Id.* [2]

---

[2]    On January 18, 2011, Verizon and LIPA filed an action against the Municipalities seeking a declaratory judgment that they "may permit lechis to be installed on their utility poles without incurring any fines or other legal sanctions and without any liability to the Defendants." No. CV 11-252, Compl. ¶ 4 (the "Verizon Action"). On February 4, 2013, District Judge Wexler stayed this action as to defendant Southampton and scheduled a bench trial regarding the sole issue of Verizon and LIPA's authority to attach lechis to their utility poles. *Id.* Electronic Orders, Feb. 4, 2013; DE 83. After the parties filed their submissions, all counsel in this action

### C.    Southampton's Alleged Interference with the Establishment of an Eruv

According to Plaintiffs, shortly after the execution of EEEA's agreements with Verizon and LIPA, officials in the Municipalities sought to actively interfere with EEEA's ability to construct the eruv. *Id.* ¶ 67.  After the existence of EEEA's licensing agreements with Verizon and LIPA became known, a group called Jewish People Opposed to the Eruv ("JPOE") and other opponents of the Eruv allegedly lobbied Southampton Town officials to interfere with the performance and discharge of EEEA's agreements with LIPA and Verizon. *Id.* ¶ 68.  On November 16, 2010, Southampton Attorney Michael C. Sordi wrote a letter to counsel for Verizon and LIPA, among others, advising of Southampton's position that the proposed Eruv would be "in contravention of our local laws." *Id.* ¶ 69.  Citing Section 330-203(B) of the Code of the Town of Southampton prohibiting the placement of signs throughout the town, Attorney Sordi stated:  "Base[d] upon the definitions of our sign law, and based upon the specification you provided to us with your letter, I am compelled to conclude that the lechis constitute a 'sign' within the meaning and intendment of our Statute.  Accordingly, the same are prohibited." *Id.* [3]

Thereafter, Southampton officials communicated with governmental officials from neighboring Quogue and Westhampton Beach to develop a coordinated plan of opposition to the

_____

interposed a consent to the jurisdiction of a United States Magistrate Judge for all purposes, pursuant to 28 U.S.C. § 636(c). *Id.* DE 98.  By Findings of Fact and Conclusions of Law dated June 16, 2014, the Court held, *inter alia*, that (1) nothing prohibited LIPA or Verizon from entering into contracts to facilitate the attachment of lechis to their utility poles in Westhampton Beach; and (2) the Court did not have enough information to determine if it could properly address whether the Quogue Village Code applied to the lechis. *Id.* DE 130.

[3]       According to Plaintiffs, Attorney Sordi's position conflicted with prior Southampton policy governing the attachment of banners to utility poles whereby Southampton would routinely issue "no objection" letters to the erection of banners across State and County roads secured by roping attached to utility poles. Compl. ¶ 70.  These "no objection" letters were frequently issued between 2008 and 2010 to secular cultural, non-profit, and artistic institutions seeking to advertise events. *Id.*

*eruv*, both in person and via email. *Id.* ¶ 73. In addition, Southampton instructed its police department not to permit the attachment of lechis, or to the extent the lechis were attached, to take them down. *Id.* ¶ 74.

### D. The First EEEA Action

On January 13, 2011, the EEEA and certain individual plaintiffs filed a Complaint in *East End Eruv, et al. v. Vill. of Westhampton Beach, et al.*, No. CV 11-213 (the "First EEEA Action"), asserting violations of their constitutional rights by Westhampton Beach, Quogue, the Town of Southampton, and a number of individual defendants, in allegedly preventing the establishment of an eruv.[4] On April 4, 2011, Plaintiffs moved for a preliminary injunction seeking to enjoin defendants from taking actions which would prevent Plaintiffs from establishing an eruv in the Municipalities and from continuing to engage in discriminatory and unconstitutional conduct against Plaintiffs. First EEEA Action, DE 42. After conducting a hearing over the course of several days, Judge Wexler denied Plaintiffs' motion by Memorandum and Order dated November 3, 2011. *East End Eruc Assoc., Inc. v. Vill. of Westhampton Beach*, 828 F. Supp. 2d 526 (E.D.N.Y. 2011).

With regard to Plaintiffs' claims against Southampton, Judge Wexler held that Plaintiffs' claims were not ripe, finding that "whether the [Southampton] Sign Ordinance applies to the attachment of lechis to utility poles in Southampton should be an issue for Southampton to decide in the first instance." *Id.* at 537. Judge Wexler found that while the Town Attorney and Town Supervisor had already determined that lechis constitute signs within the meaning of the Sign Ordinance, those determinations were not "decisions of the 'Town' on the issue, because

---

[4] Pursuant to stipulation, plaintiffs in the EEEA Action filed an Amended Complaint on February 3, 2012, removing all of the individual defendants, among other things.

enforcement of the Sign Ordinance lies with Southampton's Building Department and ZBA." *Id.*

Judge Wexler further explained:

> It is uncontested that plaintiffs never instituted any request for a variance or interpretation of a Building Department determination. Mindful that land use disputes are uniquely matters of local concern more aptly suited for local resolution, the Court concludes that Southampton should be given the opportunity to determine whether lechis of the size and composition now proposed by plaintiffs, within the newly proposed -- and still unclear --boundaries of the eruv, are "signs" within the meaning of the Sign Ordinance.

*Id.* at 537-38. Judge Wexler further found that even assuming Plaintiffs' claims were ripe and that Plaintiffs had demonstrated irreparable harm, Plaintiffs had failed to establish a likelihood of success on the merits of any of their claims. *Id.* at 538.

With regard to Quogue and Westhampton Beach, Judge Wexler found as follows:

> the applicability of Quogue's sign ordinance (governing encroachments and projections on its rights-of-way) to the attachment of lechis to utility poles appears questionable Notwithstanding the questionable applicability of Quogue's code provisions, and that Westhampton Beach does not have an applicable sign ordinance or an application procedure that plaintiffs are required to follow, the Court suggests that plaintiffs propose a revised eruv plan to Quogue and Westhampton Beach for their consideration prior to any conference with the Court.

*Id.* at 541. Accordingly, Judge Wexler denied Plaintiffs' motion, without prejudice, as against Quogue and Westhampton Beach. *Id.* at 541-42.

    **E.    In Compliance with Judge Wexler's Order,
Plaintiffs Seek Relief before Southampton**

    *1.    EEEA is Instructed on the Proper Procedures for Sign Applications*

In accordance with the November 30, 2011 Memorandum and Order, Plaintiffs retained Paul V. Craco of Craco & Ellsworth, LLP, as local counsel to prosecute their sign application to Southampton. Compl. ¶ 82. In January 2012, Attorney Craco contacted the Southampton Building Department to open a file for EEEA's forthcoming sign application and obtain a copy

of that application form. *Id.* ¶ 83. Based on Southampton's representations during the preliminary injunction proceedings in the First EEEA Action, EEEA was led to believe that making such an application would be a necessary first step. *Id.* ¶ 84.

Thereafter, however, Attorney Craco learned from the Southampton Town Attorney that EEEA could not submit a sign application yet because EEEA had taken the position that a lechi is not a sign at all. *Id.* ¶ 86. According to the Town Attorney, EEEA was required to first send a letter to the Chief Building Inspector requesting an interpretation as to whether a lechi is a sign, which -- if denied -- could then be appealed to the ZBA. *Id.* ¶ 87. Attorney Craco was further informed that EEEA's deadline for mounting an appeal to the ZBA would be sixty days after the filing of the Chief Building Inspector's interpretation *Id.* This requirement was later confirmed by the Town's outside counsel, who informed Attorney Craco, on behalf of EEEA, to follow the following procedure: (1) submit an interpretation request letter to the Chief Building Inspector; (2) await a response; (3) appeal the denial to the ZBA; (4) await a response; and, if the ZBA were to rule against EEEA on the interpretation issue, (5) return to the Building Department and submit a sign permit application. *Id.* ¶¶ 87-90. Although Attorney Craco pointed out that this procedure could result in a lengthy delay of any possible relief for EEEA, he was informed that the Building Department would accept only an interpretation request letter from EEEA in the first instance, and not a sign permit application. *Id.* ¶ 90.

### 2. *The Chief Building Inspector Denies EEEA's Interpretation Request*

By letter dated April 17, 2012, EEEA requested a determination from the Chief Building Inspector that lechis are not signs within the meaning of the Sign Ordinance. *Id.* ¶ 91 and Ex. MM. That request was denied on April 27, 2012, when the Chief Building Inspector emailed

Attorney Craco a letter response indicating that a lechi qualifies as a sign within the meaning of the Sign Ordinance (the "Interpretation Letter"). *Id.* ¶ 94 and Ex. RR.

### 3. *EEEA Obtains New Zoning Counsel*

According to the Complaint, between March and April of 2012, both the Chief Building Inspector and the Town's outside litigation counsel provided Attorney Craco with inconsistent and conflicting instructions regarding the appropriate procedures EEEA should follow in order to exhaust its administrative remedies at the Town level. *Id.* ¶¶ 98-104. Troubled by these inconsistencies, EEEA sought counsel with "more significant experience in zoning matters in order to confirm that the process Southampton was prescribing for EEEA was lawful and not arbitrary." *Id.* ¶ 100. EEEA had difficulty finding a zoning lawyer in Suffolk County who would represent EEEA before the Town Building Department and the ZBA, as several lawyers EEEA approached declined to take the case due to its high-profile and sensitive nature. *Id.* In late June of 2012, EEEA finally succeeded in retaining a zoning lawyer, namely, Michael L. McCarthy. *Id.*

### 4. *EEEA is Informed that Any Interpretation Appeal or Variance Application is Time-Barred*

On Friday, June 29, 2012, Southampton's outside litigation counsel filed a letter with the Court in the First EEEA Action in which he claimed that EEEA was time-barred from submitting an interpretation appeal and variance application to the ZBA because EEEA had not filed an appeal with the ZBA within sixty days of April 27, 2012, the date that the Chief Building Inspector emailed the Interpretation Letter to Attorney Craco. *Id.* ¶ 101 and Ex. TT. On July 2, 2012, Attorney McCarthy called Southampton's outside litigation counsel and pointed out that in all of his years of zoning experience, he had never heard of a town building department declining to re-issue an interpretation letter simply because the applicant had not mounted an appeal within

sixty days of the filing of the decision.  *Id.* ¶ 102.  Rather, it was common for town building inspectors to re-date their interpretation letters to allow applicants to submit appeals to the zoning board of appeals within the sixty-day time frame.  *Id.*  According to the Complaint, Southampton's "outside litigation counsel did not disagree, but stated that the Town was tired of paying legal fees in connection with this matter."  *Id.*  Outside counsel informed Mr. McCarthy that he would have to confer with Southampton as to whether Southampton would consent to the ZBA's exercise of jurisdiction over EEEA's appeal and application.  *Id.*  Thereafter, on July 3, 2012, Southampton's outside litigation counsel contacted Mr. McCarthy to inform him that Southampton would not retract its position, and that it was Southampton's position that the Interpretation Letter was a final determination that would not be re-issued.  *Id.* at 103.

On July 5, 2012, EEEA filed a letter in the First EEEA Action responding to the assertions made in Southampton's outside litigation counsel's June 29, 2012 letter.  *Id.* ¶ 104 and EX. UU.  EEEA pointed out that even if it were true that the Chief Building Inspector's act of emailing the Interpretation Letter to Attorney Craco on April 27, 2012 and filing it in the Inspector's office triggered the 60-day limitations period provided for in Section 267-a of the Town Law, this was no bar to the Chief Building Inspector simply reissuing the Interpretation Letter to afford EEEA the opportunity to prosecute its appeal and application before the ZBA. *Id.*  EEEA further explained that the "onus for EEEA's delay in submitting its appeal and application to the ZBA lay with the Town, which had vacillated and shifted in the guidance it provided regarding the appropriate procedures EEEA should follow in order to exhaust its administrative remedies at the Town level."  *Id.*  In response, the Town's outside litigation counsel maintained that EEEA was jurisdictionally time-barred from taking an appeal to the ZBA.  *Id.* ¶ 105 and Ex. VV.

**5.**     *EEEA Seeks Reexamination of the*
              *Chief Building Inspector's Determination*

On July 19, 2012, Attorney McCarthy submitted a letter to the Chief Building

Inspector on behalf of EEEA in which he requested reexamination of the determination in the

Interpretation Letter that lechis are "signs."  *Id.* ¶ 108 and Ex. YY.  By letter dated July 30, 2012,

Southampton Attorney Tiffany Scarlato responded that the relief was denied on the grounds that

"any review of [the Interpretation Letter] would have been made pursuant to Southampton Town

Code §330-165 by way of an appeal to the [ZBA, and absent an appeal,] there is no

'reexamination' available . . . ."  *Id.* ¶ 109 Ex. ZZ.

**6.**     *EEEA Files Sign Permit Applications and*
              *Appeals the Denial of its Request for Reexamination*

According to Plaintiffs, the Interpretation Letter issued by the Chief Building Inspector

did not confer jurisdiction on the ZBA under Town law to consider an appeal or application from

the EEEA.  *Id.* ¶ 111.  Instead, the trigger for ZBA jurisdiction over EEEA's case would be a

denial of a permit by the Chief Building Inspector based on his interpretation of the Sign

Ordinance, not an interpretation by itself.  *Id.*  The EEEA therefore prepared twenty-eight sign

permit applications for submission to the Town Building Department -- one for each lechi that it

was proposing to attach to a total of fifteen utility poles within the unincorporated area of

Southampton.  *Id.* ¶ 113.  These applications were delivered to the Building Department on

September 14, 2012.  *Id.*  On September 28, 2012, EEEA also submitted an appeal from the

Town Attorney's July 30, 2012 letter denying its request for reexamination.  *Id.* ¶ 114 and

Ex. BBB.

On October 4, 2014, EEEA was informed that its appeal could not be processed without

the submission of a completed ZBA application and the requisite fee of $500.  *Id.* ¶ 115 and

Ex. CCC.  Thereafter, Senior Building Inspector Mark Viseckas, writing on behalf of the Chief

Building Inspector, denied all twenty-eight Sign Permit Applications noting that EEEA must first

obtain use variances from the ZBA in order to install the lechis on the utility poles.  *Id.* ¶ 16 and

Ex. DDD.

> **7.    EEEA Appeals the Adverse Determinations from the
> Building Department and Town Attorney's Office
> to the ZBA and Applies for Variances on the Lechis**

On December 4, 2012, EEEA appealed the Town's denial of the Sign Permit

Applications and the Town's determination that lechis qualify as "signs" within the meaning of

the Sign Ordinance.  *Id.* ¶ 117 and Ex. EEE.  In the alternative, the appeal requested "that the

Board grant EEEA area and/or use variances, permitting the attachment of lechis to the utility

poles in question located within the Town."  *Id.*  A public hearing before the ZBA regarding

EEEA's appeal was scheduled for April 4, 2013.  *Id.* ¶ 119.

> **8.    Judge Wexler Finds that EEEA's Claims Against Southampton are
> Still Not Ripe and Dismisses Southampton from the First EEEA Action**

On February 4, 2013, the parties appeared before Judge Wexler in the First EEEA Action

along with two other related actions.  *See* Tr. of Feb. 4, 2013 Proceedings Before Hon. Leonard

D. Wexler, Case No. 11-252, DE 106-13 ("Feb. 4, 2013 Tr.").  EEEA's counsel advised the

Court that EEEA had a hearing date before the ZBA on April 4, 2013.  *Id.* at 5.  Finding that

EEEA's claims against Southampton were still not ripe, Judge Wexler dismissed Southampton

from the action.  *Id.* at 9.

> **9.    The Decision by the ZBA**

On April 4, 2013, the ZBA held a public hearing to address: "(1) whether lechis

are 'signs' subject to regulation under the Southampton Town Ordinance; (2) whether,

irrespective of whether the lechis are 'signs,' they should be treated as exempt or unregulated

signs within the meaning of the Southampton Town Ordinance; and (3) whether, alternatively, EEEA should be granted an area or use variance." Compl. ¶ 123. On June 6, 2013, the ZBA held a continuation of the public hearing to continue discussion and permit further testimony from counsel and members of the public on the topic of EEEA's appeal and variance application. *Id.* ¶ 135.

The ZBA issued its decision on August 1, 2013. *Id.* ¶ 144 and Ex. A. The ZBA found that EEEA was time-barred from appealing the Chief Building Inspector's finding that lechis are signs and denied EEEA's application for a variance permitting the affixation of twenty-eight signs to fifteen utility poles within Southampton. *Id.* With regard to the timeliness issue, the ZBA made no independent determination as to whether a lechi is a sign under the Town Code. *Id.* ¶ 145 and Ex. A. Instead, the ZBA held that the appeal of the Chief Building Inspector's finding that lechis are signs was time-barred for failure to initiate the appeal within the sixty days allotted under New York State Town Law. *Id.* Ex. A. With regard to the variance issue, the ZBA held that EEEA's application mandated application of the use variance standard (as opposed to the area variance standard) and that EEEA had failed to satisfy that standard which requires a showing that the applicable regulations and restrictions have caused "unnecessary hardship." *Id.* Specifically, the ZBA found, *inter alia*, that EEEA failed to show that (1) the alleged hardship caused by the zoning restrictions was unique, (2) the requested variances would not alter the essential character of the neighborhood; and (3) the alleged hardship had not been self-created. *Id.* The ZBA also found that "[t]he granting of the requested relief on the scale and in the locations requested by the applicant would amount to a de facto amendment of the Town's sign ordinance." *Id.*

### F. EEEA Files the Instant Action

Plaintiffs filed the instant action against Southampton and the Southampton ZBA on August 27, 2013. The Complaint asserts six causes of action: (1) a violation of the First and Fourteenth Amendments to the United States Constitution based on Defendants' actions in denying Plaintiffs their rights to freely practice their religion; (2) a violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, based on Defendants' actions in failing to uniformly enforce Town laws in a manner that treats a religious assembly or institution on less than equal terms with a non-religious assembly or institution; (3) a judgment declaring that "(a) there is no local, state, or federal law that either prohibits the affixation of the lechis to certain poles in Southampton or that requires Municipal approval for such attachments, including a declaration that § 330-203(B) of the Code of the Town of Southampton is inapplicable to the lechis, and (b) Verizon and LIPA should therefore be free and clear to implement contracts to construct the Eruv"; (4) a violation of 42 U.S.C. § 1983 based on Defendants' actions under color of State Law in depriving plaintiffs of their "rights, privileges or immunities secured by the Constitution and the laws of the United States"; (5) tortious interference with EEEA's contracts with Verizon and LIPA whereby Verizon and LIPA agreed to allow EEEA to affix lechis to Verizon's and LIPA's poles to complete an eruv; and (6) a declaration that the ZBA's denial of the EEEA's appeal and variance application was "arbitrary and capricious" and contrary to New York law and directing the ZBA to issue any necessary approvals and permits to allow EEEA to construct the eruv. Compl. ¶¶ 158-201.

## III. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the Complaint as true and draw all reasonable inferences in favor

of the Plaintiff.  *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Reed v. Garden City Union Free Sch. Dist.*, 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013); *Camlin Ltd. v. CMB Additives LLC*, No. 07-CV-4364, 2012 WL 5928443, at *1 (E.D.N.Y. Nov. 19, 2012).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546, 127 S. Ct. 1955, 1959 (2007).  The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss.  District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  556 U.S. at 679.  Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id.*; *Brookfield Asset Mgmt., Inc. v. AIG Fin. Prods. Corp.*, No. 09-CV-8285, 2010 WL 3910590, at *4 (S.D.N.Y. Sept. 29, 2010) ("A complaint is inadequately pled 'if it tenders naked assertions' devoid of 'further factual enhancement.'") (quoting *Iqbal*, 129 S. Ct. at 1949).  Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully."  *Id*. at 678 (citing *Twombly*, 550 U.S. at 556-57) (internal citations omitted).

**IV.** **DISCUSSION**

    **A.**     **Plaintiffs' Request to Strike the Liccione Declaration is Granted**

    Prior to filing their motion, Defendants filed a letter motion with the Court, on consent of all parties, seeking an enlargement of the page limit for memoranda of law in support of and in opposition to Defendants' upcoming motion to dismiss. DE 27. The parties requested a fifty-page limit per brief. *Id.* On December 27, 2013, the Court granted Defendants' letter motion in part, ruling that the parties could serve memoranda of law not to exceed forty pages. Electronic Order, Dec. 27, 2013. In addition, the Court stated, "To the extent that the facts are driving the recitation, counsel can utilize affidavits from an individual with first-hand knowledge (not counsel) to set forth the facts germane to the motion." *Id.*

    Thereafter, Defendants filed a letter seeking clarification of the Court's December 27, 2013 Order. DE 29. Specifically, Defendants sought permission to file a declaration of counsel -- as opposed to a fact witness -- summarizing the exhibits to the Complaint, the documents incorporated by reference in the Complaint, and the documents intrinsic to the Complaint. *Id.* By Order dated January 2, 2014, the Court indicated that counsel could "submit any declaration they wish if the purpose is to attach exhibits related to the motion to dismiss." Electronic Order, Jan. 2, 2014.

    In support of their motion to dismiss, Defendants submitted a twenty-one page declaration of Maureen T. Liccione, a member of the firm of Jaspan, Schlesinger, LLP, attorneys for the Defendants. DE 40. Defendants also submitted a forty page memorandum of law. DE 42. Plaintiffs now argue that Defendants have submitted "what amounts to a 61-page brief in defiance of this Court's orders." Pls.' Opp'n to Defendant Town of Southampton's Mot. to Dismiss ("Pls.' Opp'n"), DE 44, at 39. Plaintiffs further argue that "nearly every document

attached to the Liccione Declaration is one that was neither appended to, incorporated in, nor integral to the Complaint . . . the majority of which consist of email correspondence [and] are not the types of documents of which judicial notice may be taken." *Id.* at 40. In response, Defendants maintain that "each paragraph of the Liccione declaration refers to an Exhibit either attached to the Complaint, part of the record or [part of] the complete email string [submitted by Plaintiffs] and was intended to comply with the Court's directive." Defendants' Reply Mem. of Law in Supp. of the Mot. To Dismiss the Compl. ("Defs.' Reply"), DE 45, at 14.

"[D]eclarations of counsel are generally properly used only to describe the documents attached to them as exhibits for the Court's consideration, not to advance factual averments or legal arguments." *Clark v. Kitt*, No. 12–CV–8061, 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014) (internal citation omitted). Consistent with that principle, the Court advised counsel that they could "submit any declaration they wish if the purpose is to attach exhibits related to the motion to dismiss." Electronic Order, Jan. 2, 2014. The Court has reviewed the Liccione Declaration and finds that to the extent it consists of factual assertions and characterizations of witness testimony, it is improperly before the Court on the instant motion to dismiss. Moreover, to the extent the Liccione Declaration contains legal argument, the Court "will not allow counsel to bypass the page limits on memoranda of law by submitting additional argument in the form of a sworn declaration." *Id.* Indeed, the Second Circuit has warned against a district court's reliance on such material when deciding a motion to dismiss under Rule 12(b)(6):

> [A] district court errs when it consider[s] affidavits and exhibits submitted by defendants or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss. Vacatur is required even where the court's ruling simply mak[es] a connection not established by the complaint alone or contains an unexplained reference that raises the possibility that it improperly relied on matters outside the pleading in granting the defendant's Rule 12(b) motion.

*Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (citations and internal quotation marks omitted). Accordingly, the Court declines to consider the Liccione Declaration in its entirety. Plaintiffs' request to strike the Liccione Declaration is therefore GRANTED.

**B.      Defendants' Motion to Dismiss for Lack of Jurisdiction**

Defendants argue that Plaintiffs' First, Third, Fourth and Sixth Causes of Action all arise under Article 78 of the N.Y. C.P.L.R. ("Article 78") and should therefore be dismissed on jurisdictional grounds. Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Defs' Mem."), DE 42, at 5. Defendants further request that the Court stay the remainder of this action, if any, until the state court resolves the Article 78 proceeding. *Id.* Plaintiffs counter that Judge Wexler has already rejected this argument in the First EEEA Action and it is therefore law of the case that Plaintiffs are not required to challenge Defendants' actions in an Article 78 proceeding. Plaintiffs alternatively argue that the Court should exercise supplemental jurisdiction over Plaintiffs' Sixth Cause of Action, which Plaintiffs contend is the only Article 78 claim. The Court will address each argument in turn, beginning with an analysis of whether Defendants' arguments are barred by the law of the case doctrine.

**1.      *Law of the Case***

**a.      Standard of Review**

The law of the case "'doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Pepper v. United States*, 131 S. Ct. 1229, 1250 (2011) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)); *see also Sussman v. Crawford*, 548 F.3d 195, 198 (2d Cir. 2008); *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148-49 (2d Cir. 1999). The purpose of the law of the case doctrine is "to 'maintain consistency and avoid reconsideration of matters once decided during

18

the course of a single continuing lawsuit.'" *Devilla v. Schriver*, 245 F.3d 192, 197 (2d Cir. 2001) (quoting 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4478 at 788 (3d ed. 1998)).  Unlike the doctrines of res judicata and collateral estoppel, the law of the case, "merely expresses the practice of the courts generally to refuse to reopen what has been decided." Devilla, 245 F.3d at 197 (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)).  Thus, law of the case is a discretionary doctrine.  *Id.*; *see also Pepper*, 131 S. Ct. at 1250 (noting that law of the case "'directs a court's discretion, it does not limit the tribunal's power'") (quoting *Arizona*, 460 U.S. at 618); *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 564 (2d Cir.1998) ("First, the [law of the case] doctrine 'is, at best, a discretionary doctrine, which does not constitute a limitation on the court's power' but merely expresses a general reluctance, absent good cause to reopen rulings that the parties have relied upon.") (quoting *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 131 (2d Cir. 1997)).  Although the doctrine is ordinarily applied in later stages of the same lawsuit, it also has application to different lawsuits between the same parties.  *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 558 F. Supp. 2d 378, 400 (E.D.N.Y. 2008) (citing *In re: PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991); *Schupak v. Califano*, 454 F. Supp. 105, 114 n.17 (E.D.N.Y. 1978)).

### b.    The Prior Ruling in the First EEEA Action

Plaintiffs argue that Judge Wexler has already held that Plaintiffs are under no obligation to assert their claims in an Article 78 proceeding.  *See* Pls.' Opp'n at 14.  In this regard, Plaintiffs rely on a transcript of proceedings before Judge Wexler in the first EEEA Action.  On

February 4, 2013, Judge Wexler heard argument from the parties in both the First EEEA Action and the Verizon Action.  *See* Feb. 4, 2013 Tr.[5]  As noted above, with regard to Southampton, EEEA's counsel advised the Court that EEEA had a hearing date before the Southampton ZBA on April 4, 2013.  *Id.* at 5.  Finding that EEEA's claims against Southampton were not ripe, Judge Wexler dismissed Southampton from the action.  *Id.* at 9.

It is not Judge Wexler's ruling as to Southampton, however, upon which Plaintiffs rely.  Instead, Plaintiffs point to Judge Wexler's rulings with regard to Quogue, a defendant in the First EEEA Action.  Before the Court can examine Judge Wexler's February 4, 2013 rulings as to Quogue, some further background is necessary.

As discussed above, by Memorandum and Order dated November 3, 2011, Judge Wexler denied Plaintiffs' request in the First EEEA Action for a preliminary injunction seeking to enjoin all three Municipalities from preventing Plaintiffs from establishing an eruv.  *East End Eruv Assoc.*, 828 F. Supp. 2d 526.  Quogue had argued that Plaintiffs were required to obtain Quogue's permission to attach lechis to utility poles in its rights-of-way pursuant to its village code provisions governing encroachments.  *Id.* at 535.  Plaintiffs, on the other hand, maintained that these provisions did not apply and, therefore, they had not sought permission from Quogue to attach the lechis.  *Id.* at 536.  While Judge Wexler noted that the applicability of Quogue's Village Code to the attachment of lechis appeared questionable, he nonetheless suggested that Plaintiffs propose a revised eruv plan to Quogue (and Westhampton Beach) for their consideration prior to any subsequent conference with the Court.  *Id.* at 541.

---

[5]     There is a third case on the caption of the February 4, 2013 Transcript – *Jewish People for the Betterment of Westhampton Beach v. The Village of Westampton Beach*, No. CV 12-3660.  That case, however, is not relevant for present purposes.

Thereafter, Quogue moved to dismiss the Amended Complaint in the First EEEA Action for lack of subject matter jurisdiction and for failure to state a claim. No. CV 11-213, DE 138. The Amended Complaint in that action asserts five claims -- which mirror the first five claims asserted in the instant case, namely, (1) violation of the First and Fourteenth Amendments; (2) violation of RLUIPA; (3) a declaratory judgment that there are no laws prohibiting the affixation of lechis to utility poles; (4) a violation of 42 U.S.C. § 1983; and (5) tortious interference with contract. *Id.* DE 135. Unlike the present case, however, the Amended Complaint in the First EEEA Action does not assert a sixth state law claim under 28 U.S.C. § 1367 seeking a declaratory judgment that any action taken by Quogue was arbitrary and capricious. *Id.*

After Quogue filed its motion to dismiss in the First EEEA Action, Plaintiffs filed a renewed motion for a preliminary injunction against Quogue, once again seeking to enjoin Quogue from taking actions which would prevent Plaintiffs from establishing an eruv in Quogue. First EEEA Action, No. CV 11-213, DE 172. The parties appeared before Judge Wexler on February 4, 2013. The following exchange took place on the record:

> THE COURT: Plaintiff, what has happened in the Quogue case?
>
> [PLAINTIFFS' COUNSEL]: Your Honor, in accordance with your directions, we went back, we submitted an application to the Quogue trustees, and the Quogue trustees denied it. They held that the lechis were covered by section 158 of their village code, and they held that any action in connection with this would be a violation of the establishment clause.
>
> We are now back here requesting the Court to issue a preliminary injunction with respect to Quogue, one, because the decision that the lechis were encroachments under the village sign law is demonstrably wrong, and, two, because if that's the case, and if the sign law does not apply, there cannot be an establishment clause violation because there would be no action required by the Village of Quogue.
>
> . . . .
>
> THE COURT: You have a final determination from Quogue?

[PLAINTIFFS' COUNSEL]: Yes, on these two issues. And we therefore suggest to your Honor that you can decide both issues, and issue a preliminary injunction with respect to the Village of Quogue. Thank you.

THE COURT: Okay.

[QUOGUE'S COUNSEL]: Your Honor, the Village of Quogue disagrees there is a final determination by the Village of Quogue.

THE COURT: The Village of Quogue has rendered a decision though.

[QUOGUE'S COUNSEL]: It has rendered a decision, your Honor, and by means of your preliminary injunction decision encouraged and directed the plaintiff to go to the villages to make an application.

Well, the plaintiff didn't continue that application. There's an appeal process, and that appeal process involves an Article 78 proceeding.

The Wilson case we cited advises the plaintiff has to go to an appeal proceeding. In this case, the plaintiff has not made any steps by way of an Article 78.

As we've argued all along, your Honor, this issue is more a local and state issue, and the plaintiff is trying to circumvent the administrative process by coming to this Court and saying it is a final decision.

Your Honor, it's a final decision in terms of case law --

THE COURT: Counsel, I disagree with you. I think it is a final decision. So now what do we do.

[QUOGUE'S COUNSEL]: So your Honor is saying that the plaintiff doesn't believe they have to go to an Article 78 proceeding?

THE COURT: That is correct.

[QUOGUE'S COUNSEL]: The next thing, the board made a well-reasoned decision --

THE COURT: If I ask you what you want me to do you are telling me they made a -- well, fine, final decision. I have to decide that.

[QUOGUE'S COUNSEL]: I would ask you to deny the preliminary injunction motion and grant our motion to dismiss.

THE COURT: Denied. I'm trying to find out if you want a trial on the preliminary [injunction] or let's go right to trial on the issue.

[QUOGUE'S COUNSEL]: Your Honor, I apologize. I'm not clear on what you are saying. Are you saying go on a trial today with regard --

> THE COURT:  Not today.  If you have more discovery, I'll give you
> time and then we'll go to trial.
>
> [QUOGUE'S COUNSEL]:  Your Honor, will you not make a decision
> with regard to the preliminary injunction motion at this point?
>
> THE COURT:  At this point I'm suggesting we go right to trial -- not
> right now.  We can set a date, do discovery, and set the other issues we have
> with the utility.

Feb. 3, 2013 Tr. at 12-16.[6]

### c.    Judge Wexler's Ruling with Regard to Quogue in the First EEEA Action is not Law of the Case with Regard to Plaintiffs' Claims Against Southampton in the Instant Action

In a four-sentence argument, Plaintiffs assert that "[a]t the February 4, 2013 conference,

counsel for the defendant Village of Quogue urged Judge Wexler to dismiss Plaintiffs' Amended

Complaint on the grounds that the claims therein should have been filed in an Article 78

proceeding—*the very same argument now pressed again by Southampton Defendants*."  Pls.'

Opp'n at 14 (emphasis in original).  According to Plaintiffs, "[b]ecause the same argument

Southampton now makes was already rejected in the Original EEEA Action, it fails under the

'law of the case' doctrine."  *Id.*  In response, Defendants argue that law of the case is not

implicated here because "(1) the colloquy quoted by Plaintiffs is from the Verizon/LIPA action

where no Art. 78 claim is alleged, and (2) there was no application for an interpretation or a

variance, both of which only can be appealed in Art. 78 proceedings."  Defs.' Reply at 4.  The

Court, in substantial part, agrees.

During the February 4, 2013 hearing, Judge Wexler denied Quogue's motion to dismiss

the Amended Complaint filed in the First EEEA Action, finding that Plaintiffs did not have to go

---

[6]    Judge Wexler also addressed a number of other pending motions at the February 4, 2013 hearing.  For example, in the Verizon Action, Judge Wexler denied pending motions to dismiss interposed by the Village of Westhampton Beach [DE 38] and the Village of Quogue [DE 39], as well as a motion for summary judgment filed by the Village of Westhampton Beach [DE 72]. *See* Verizon Action, Electronic Order, Feb. 4, 2013.

back to state court to pursue an Article 78 proceeding. Although the plaintiffs in both the First

EEEA Action and the instant action overlap -- to the extent that EEEA, Deborah Pollack and

Simcha Pollack are Plaintiffs in both suits, that is where the similarities end. In the First EEEA

Action, Judge Wexler was dealing with an Amended Complaint against Quogue in which there

was no explicit Article 78 cause of action pled. Moreover, in that case, the Quogue trustees

declined to grant permission for Plaintiffs to attach lechis to utility poles, finding that lechis were

encroachments under Quogue's Village Code. The present case, on the other hand, involves

Plaintiffs' claims against Southampton and the Southampton ZBA and the instant Complaint

asserts a claim under Article 78, seeking to set aside the Southampton ZBA's determinations as

arbitrary and capricious. Moreover, in this action, there *was* a ZBA denial of a variance and a

determination not to allow an appeal of a Building Inspector's Interpretation because the statute

of limitations had expired. Thus, not only are the parties different, but the factual circumstances

and issues before the Court vary as well. As noted above, the law of the case doctrine suggests

"'that when a court decides upon a rule of law, that decision should continue to govern the *same*

*issues* in subsequent stages in the same case.'" *Pepper*, 131 S. Ct. at 1250 (quoting *Arizona*, 460

U.S. at 618). Even though the doctrine may apply "to different lawsuits between the same

parties," *L.I. Head Start*, 558 F. Supp. 2d at 400, Plaintiffs have cited no case for the proposition

that the doctrine applies to different parties in different cases involving different circumstances.

*See Cane Tenn., Inc. v. United States*, 62. Fed. Cl. 703, 711 n.9 (Fed. Cl. 2004) ("The law of the

case doctrine does not operate to preclude the court from revisiting an issue, particularly with

reference to the different factual circumstances of different parties.") (internal citation and

quotation marks omitted). The Court therefore finds that the law of the case doctrine does not

apply here.

Plaintiffs' reliance on this Court's decision in *Verizon New York Inc. v. Vill. of Westhampton Beach*, Nos. CV 11-252, CV 11-213, 2013 WL 5762926 (E.D.N.Y. Oct. 18, 2013) does not compel a different conclusion. In that case, the Court denied motions to stay the proceedings in the First EEEA Action and the Verizon Action by proposed intervenor Jewish People for the Betterment of Westhampton Beach a/k/a Jewish People Opposed to the Eruv ("JPOE") pending JPOE's appeal of Judge Wexler's denial of its motion to intervene in both actions. *Id.* at *1. In analyzing whether JPOE had made a showing that it had an interest in the two actions, the Court noted that Verizon and LIPA argued that JPOE's claims had already been addressed and dismissed by Judge Wexler when he dismissed a separate lawsuit filed by JPOE against EEEA, Westhampton Beach, Verizon and LIPA (the "JPOE Action"). *Id.* at *2, 5. The Court stated, "For reasons unknown to the Court, Verizon and LIPA have not asserted the 'law of the case' doctrine and have elected instead to argue [that JPOE's claims were barred by] res judicata." *Id.* at *5 n.6. Unlike the circumstances in the present case, the parties and issues at hand in the motion to dismiss the JPOE Action were the same as those in the motion to stay the First EEEA and Verizon Actions. In any event, the Court's mere suggestion in dictum that the law of the case doctrine might apply in those actions hardly supports the conclusion that the doctrine is applicable here where the issues before the Court in the present action with regard to Southampton differ markedly from those before Judge Wexler in the First EEEA action with regard to Quogue. Simply stated, it cannot be said that Judge Wexler's denial of Quogue's motion to dismiss the Amended Complaint in the First EEEA Action -- which did not allege an Article 78 claim and involved different circumstances -- forecloses this Court's consideration of the Southampton Defendants' motion to dismiss an Article 78 claim in the instant case.

Accordingly, the Court, in its discretion, declines to apply the law of the case doctrine here and instead will address Defendants' arguments on the merits.

## 2. *Supplemental Jurisdiction and Article 78 Claims*

### a. **The Parties' Arguments**

Defendants argue that the Sixth Cause of Action -- which is brought only against the ZBA under New York law -- as well as the First, Third and Fourth Causes of Action must be dismissed because they all arise under Article 78. Defs.' Mem. at 2. In this regard, Defendants maintain that "[f]ederal district courts in New York nearly uniformly decline to exercise supplemental jurisdiction over Article 78 proceedings for lack of subject matter jurisdiction." *Id.* In response, Plaintiffs concede that the Sixth Cause of Action asserts a state law claim that essentially incorporates the Article 78 standard. Pls.' Opp'n at 10. Notwithstanding that fact, Plaintiffs argue that the Court should exercise supplemental jurisdiction over this claim because "[i]t is well-established in the Second Circuit that district courts may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over state law claims that could otherwise be asserted in an Article 78 proceeding." *Id.* at 9. In addition, Plaintiffs argue that the First, Third and Fourth Causes of Action assert as-applied challenges to the actions of Southampton and the ZBA, claims over which this Court has original jurisdiction and should therefore not be dismissed. *Id.* at 13.

### b. **The Sixth Cause of Action Asserts a Claim Under Article 78**

The Sixth Cause of Action asserts a claim under New York law "(a) determining and declaring that the ZBA's denial of the EEEA's appeal and variance application was and is arbitrary and capricious and contrary to New York State law; and (b) compelling and directing

the ZBA to issue any necessary approvals and permits to allow EEEA to construct the Eruv."

Compl. ¶ 201(E).   Jurisdiction is premised solely upon supplemental jurisdiction under

28 U.S.C. § 1367.  *Id.* ¶ 197.

Article 78 of the CPLR provides that a party is entitled to relief from a local zoning

decision that is "arbitrary and capricious" or is not "supported by substantial evidence."  N.Y.

CPLR §§ 7803(3)-(4) (McKinney 2014).  Here, as Plaintiffs acknowledge, the Sixth Cause of

Action incorporates the Article 78 standard.  Thus, notwithstanding the fact that this claim does

not make explicit reference to Article 78, it clearly seeks relief pursuant to this CPLR provision.

Moreover, because this cause of action is based on state law, in the absence of diversity, the

claim may be brought in this Court only through the exercise of supplemental jurisdiction.  *See*

*Coastal Commc'ns Serv., Inc. v. City of New York*, 658 F. Supp. 2d 425, 459 (E.D.N.Y. 2009)

(citing 28 U.S.C. § 1367).

Defendants also move to dismiss the First, Third, and Fourth Causes of Action for lack of

supplemental jurisdiction, arguing that all three of these claims challenge the Defendants' actions

and therefore arise under Article 78.  The First and Fourth Causes of Action, however, assert

claims over which this Court has original jurisdiction, namely under the First and Fourteenth

Amendments to the United States Constitution, and 42 U.S.C. § 1983, respectively.  *See* Compl.

¶¶ 158-164, 181-84.  Thus, the Court declines to treat these claims as seeking limited relief under

Article 78 and New York law.

The Third Cause of Action seeks a declaratory judgment under 28 U.S.C. § 2201

that "(a) there is no local, state, or *federal* law that either prohibits the affixation of the lechis to

certain poles in . . . Southampton or that requires Municipal approval for such attachments,

including a declaration that § 330-203(B) of the Code of the Town of Southampton is

inapplicable to the lechis, and (b) Verizon and LIPA should therefore be free and clear to implement contracts to construct the Eruv." *Id.* ¶ 180 (emphasis added). It seeks to "(1) permanently enjoin[] Southampton from continuing to engage in the discriminatory practices alleged therein; [and to] (2) permanently enjoin[] Southampton from taking any actions which would prevent the plaintiffs from affixing lechis to Verizon's and LIPA's utility poles or otherwise constructing and maintaining the Eruv." *Id.* ¶ 201(B). This claim is brought under the Declaratory Judgment Act, 28 U.S.C. § 2201. Although neither party addresses this issue, the Supreme Court has held that "the Declaratory Judgment Act does not 'extend' the 'jurisdiction' of the federal courts." *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014) (quoting *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)). Rather, when determining declaratory judgment jurisdiction, federal courts "often look to the 'character of the threatened action.'" *Id.* (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 248 (1952)). "That is to say, they ask whether 'a coercive action' brought by 'the declaratory judgment defendant'. . . 'would necessarily present a federal question.'" *Id.* (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 19 (1983)).

Here, the Third Cause of Action seeks a declaration, *inter alia*, that there is no federal law which prohibits the construction of an eruv. Thus, if Plaintiffs were to begin constructing an eruv, Defendants could challenge that action by bringing a claim under the Establishment Clause. The Court therefore finds that the Third Cause of Action arises under this Court's original jurisdiction.

In sum, in considering whether Plaintiffs' claims should be dismissed for lack of subject matter jurisdiction under 28 U.S.C. § 1367, the Court will limit its analysis to the Sixth Cause of Action, *i.e.*, Plaintiff's Article 78 claim.

**c.**      ***The Court Declines to Exercise Jurisdiction Over Plaintiffs' Article 78 Claim***

Article 78 of the CPLR provides that a party is entitled to relief from a local zoning decision that is "arbitrary and capricious" or is not "supported by substantial evidence." N.Y. CPLR §§ 7803(3) - (4) (McKinney 2014). Because an Article 78 claim is based on state law, this Court is only empowered to entertain this claim through an exercise of its supplemental jurisdiction. 28 U.S.C. § 1367.

"The overwhelming majority of district courts confronted with the question of whether to exercise supplemental jurisdiction over Article 78 claims have found that they are without power to do so or have declined to do so." *Clear Wireless L.L.C. v. Bldg. Dep't of Lynbrook*, No. 10–CV–5055, 2012 WL 826749, at *9 (E.D.N.Y. Mar. 8, 2012) (quoting *Coastal*, 658 F. Supp. 2d at 459); *see also Kent v. New York*, No. 1:11–CV–1533, 2012 WL 6024998, at *11 (N.D.N.Y. Dec. 4, 2012) ("[T]he Court follows the 'essentially unanimous position of the New York district Courts' and declines to exercise jurisdiction over plaintiffs' state-law claims brought under Article 78."), *reconsideration denied*, 2013 WL 3455729 (N.D.N.Y. July 9, 2013); *Minima v. N.Y. City Emp. Retirement Sys.*, No. 11–CV–2191, 2012 WL 4049822, at *8 (E.D.N.Y. Aug. 17, 2012) (noting that "there may be rare circumstances under which a federal court might conduct an Article 78 proceeding" but recommending that the district court decline to do so), *Report and Recommendation adopted by* 2012 WL 4049978 (E.D.N.Y. Sept. 13, 2012); *DeJesus v. City of New York*, No. 10 Civ. 9400, 2012 WL 569176, at *4 (S.D.N.Y. Feb. 21, 2012) ("Article 78 is not in and of itself a cause of action, but a procedure best suited for state courts. Recognizing

state courts' exclusive jurisdiction over Article 78, courts within this circuit have consistently declined to exercise supplemental jurisdiction over Article 78 claims."); *Brevot v. N.Y.C. Dep't of Educ.*, No. 04 Civ. 7959, 2007 WL 690130, at *9 (S.D.N.Y. Mar. 6, 2007) ("'[F]ederal courts are loath to exercise jurisdiction over Article 78 claims.'") (quoting *Birmingham v. Ogden*, 70 F. Supp. 2d 353, 372 (S.D.N.Y. 1999)), *aff'd*, 299 F. App'x 19 (2d Cir. 2008); *Morningside Supermarket Corp. v. N.Y. State Dep't of Health*, 432 F. Supp. 2d 334, 346 (S.D.N.Y. 2006) (finding that the "very nature of an Article 78 proceeding" presents "compelling reasons" under 28 U.S.C. § 1367(c) for declining jurisdiction); *Blatch ex rel. Clay v. Hernandez*, 360 F. Supp. 2d 595, 637 (S.D.N.Y. Mar. 30, 2005) (finding that plaintiffs' Article 78 claim "must be dismissed for lack of subject matter jurisdiction, as New York State has not empowered the federal courts to consider such claims"); *Cartagena v. City of N.Y.*, 257 F. Supp. 2d 708, 709 (S.D.N.Y. 2003) ("State law does not permit Article 78 proceedings to be brought in federal court, and hence I conclude that I do not have the power to exercise supplemental jurisdiction over Cartagena's Article 78 claims."); *Verbeek v. Teller*, 114 F. Supp. 2d 139, 143 (E.D.N.Y. 2000) (declining to exercise supplemental jurisdiction over Article 78 claim: "Even where a plaintiff has one or more federal claims still alive . . . the interests of judicial economy are not served by embroiling this court in a dispute over local laws and state procedural requirements.").

Despite the near unanimous view of the district courts in this Circuit, the Second Circuit has declined to decide whether Article 78 itself deprives federal courts of subject matter jurisdiction. *See Carver v. Nassau Cnty. Interim Fin. Auth.*, 730 F.3d 150, 155 (2d Cir. 2013) ("We need not decide . . . whether Article 78 can, on its own, deprive a federal court of jurisdiction over claims brought under that provision, as some district court cases have held."). In *Carver*, the plaintiffs were representatives of various Nassau County police unions who

sought to contest a wage freeze imposed in 2011 on Nassau County employees, including police

officers, by the Nassau Interim Finance Authority ("NIFA"), a public benefit corporation formed

by the New York State Legislature in 2000 in response to the growing financial crisis facing

Nassau County. *Id.* at 152. The police unions argued that the wage freeze was unconstitutional

and that the authority conferred on NIFA to impose such a freeze had expired under the terms of

the applicable statute, N.Y. Pub. Auth. Law § 3669(3). *Id.* The district court granted summary

judgment to the police unions on their state law claim without reaching the constitutional

question. *Id.* On appeal, defendants argued that the applicable statute was wrongly construed

and that the district judge abused his discretion in exercising jurisdiction over the pendent state

law claim. *Id.*

In addressing the state law claim, which the Second Circuit found presented "an

unresolved question of state law," the Second Circuit noted that the Supreme Court's decision in

*City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–68 (1997) suggested that a federal

court could exercise supplemental jurisdiction over Article 78 claims "as long as those claims

would otherwise fall within the court's pendent jurisdiction." 730 F.3d at 155. Notwithstanding

that fact, the Second Circuit recognized the state preference to handle these claims on its own

and held that the district court abused its discretion in exercising supplemental jurisdiction over

the state law claim:

> For present purposes, it is enough to recognize that Article 78 reflects a
> state preference for a state mode of procedure that "is designed to
> facilitate a summary disposition of the issues presented . . . and has
> been described as a fast and cheap way to implement a right that is as
> plenary as an action, culminating in a judgment, but is brought on with
> the ease, speed and inexpensiveness of a mere motion." *Davidson v.
> Capuano*, 792 F.2d 275, 280 (2d Cir.1986) (internal quotation marks
> and citations omitted). Whether or not Article 78 can itself deprive the
> district court of jurisdiction over claims brought under its provisions,

> the state preference to try Article 78 claims in state court bears on our assessment of whether the district court abused its discretion in deciding nonetheless to exercise pendent jurisdiction here, where other factors, too, strongly support declining that jurisdiction. We hold that the district court abused its discretion in exercising pendent jurisdiction.

*Id.* The case then proceeded to the New York State Supreme Court, which reached a decision directly contrary to that of the federal district court. *Carver v. Nassau County Interim Fin. Auth.*, No. 12934-13 (N.Y. Sup. Ct. Nassau Cnty. Mar. 11, 2014).

Here, even assuming that the Court could properly exercise supplemental jurisdiction over Plaintiffs' Article 78 claim under 28 U.S.C. § 1367, the Court has discretion to decline to do so if there are "compelling reasons for declining jurisdiction." *Id.* § 1367(c)(4). The Court agrees with the essentially unanimous position of the New York federal district courts that "'[t]he very nature of an Article 78 proceeding presents such compelling reasons.'" *Nat'l Fuel Gas Supply Corp. v. Town of Wales*, 904 F. Supp. 2d 324, 336 (W.D.N.Y. 2012) (quoting *Morningside*, 432 F. Supp. 2d at 347); *see also Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 210 (W.D.N.Y. 2103) ("[I]t is appropriate to decline supplemental jurisdiction over Article 78 claims in most cases.") (citing *N.Y. State Corr. Officers & Police Benevolent Assoc., Inv. v. New York*, 911 F. Supp. 2d 111, 132 (N.D.N.Y. 2012)); *Coastal*, 658 F. Supp. 2d at 460 (declining to exercise jurisdiction under 28 U.S.C. § 1367(c) over Article 78 claim); *Brevot*, 2007 WL 690130, at *9 (same). As explained by Judge Vitaliano,

> To be sure, federal courts have, with rare exception, denied supplemental jurisdiction to Article 78 claims. Case law has catalogued a myriad of good reasons, especially when, as here, the claims are brought to obtain judicial review of the actions of a state or local administrative agency. Comity suggests such review be afforded by the state apparatus by which the agency is created and authorized to act.

*Coastal*, 658 F. Supp. 2d at 460; *see also Kent*, 2012 WL 6024998, at *11 ("While it is true that the federal claims and state-law issues arise out of the same operative set of facts, this Court declines to exercise supplemental jurisdiction over plaintiffs' Article 78 claim because to do so would require this Court to interpret state law before the New York State courts have an opportunity to analyze and resolve the issues."); *Bd. of Managers of Soho Int'l Arts Condominium v. City of New York*, No. 01 Civ. 1226, 2004 WL 1982520, at *28 (S.D.N.Y. Sept. 8, 2004) ("The Article 78 proceeding is a unique state procedural law best left to the expertise of the state courts, the very places where the state legislature intended such actions to be tried."). This is true even where a plaintiff has some surviving federal claims. As stated by the court in *Birmingham v. Ogden*, 70 F. Supp. 2d 353 (S.D.N.Y. 1999):

> Plaintiff asks this court to function as a state tribunal and conduct an Article 78 hearing. The courts that have addressed such a request have noted that Article 78 is "a novel and special creation of state law" and "a purely state procedural remedy." *See, e.g., Camacho v. Brandon,* 56 F. Supp. 2d 370, 379-80 (S.D.N.Y. 1999) (citations omitted); *Lucchese v. Carboni*, 22 F. Supp. 2d 256, 258 (S.D.N.Y.1998). Article 78 provides a special proceeding for judicial review of action by "every court, tribunal, board, corporation, officer, or other person, or aggregation of persons . . . ." N.Y.C.P.L.R. § 7802(a). "[I]t cannot be said that an Article 78 proceeding . . . . is a suit of a civil nature at common law or in equity." *Herrmann v. Brooklyn Law School*, 432 F. Supp. 236, 240 (E.D.N.Y. 1976). Rather, Article 78 actions were "designed for the state courts, and are best suited to adjudication there." *Lucchese*[, 22 F. Supp. 2d] at 258 (citing *Herrmann* [, 432 F. Supp. 2d] at 240).
>
> Counsel for plaintiff, having served as counsel in both the *Camacho* and *Lucchese* cases, is well aware that the federal courts are loath to exercise jurisdiction over Article 78 claims. Even where a plaintiff has one or more federal claims still alive -- as did plaintiffs *Camacho* and *Lucchese*, and as does *Birmingham* -- the interests of judicial economy are not served by embroiling this court in a dispute over local laws and state procedural requirements. Article 78 "is designed to facilitate a 'summary disposition' of the issues presented, [and] . . . is 'a fast and cheap way to implement a right.'" *Lucchese*[, 22 F. Supp. 2d] at 256 (quoting *Davidson v. Capuano*, 792 F.2d 275, 280 (2d Cir. 1986)). I decline to exercise supplemental jurisdiction

> over plaintiff's Article 78 claim, and remit him to state court to seek
> review of his termination through the special vehicle the state has
> provided for such review.

*Id.* at 372-73; *see also Bd. of Managers,* 2004 WL 1982520, at *28-29 (declining to exercise jurisdiction over Article 78 claim despite existence of federal claims); *Adler v. Pataki*, 204 F. Supp. 2d 384, 396 (N.D.N.Y. 2002) (same); *Verbeek*, 114 F. Supp. at 143 (quoting *Birmingham* and declining to exercise jurisdiction over Article 78 claim despite existence of five federal claims).

Moreover, the Court has reviewed the cases cited by Plaintiffs in support of their request that the Court exercise supplemental jurisdiction and finds those actions inapposite to the present circumstances. In *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855 (2d Cir. 1988), the Second Circuit affirmed the district's court's decision authorizing removal of an Article 78 proceeding under the All Writs Act, 28 U.S.C. § 1651. The trial court ordered the state court case to be removed because the issues raised by the Article 78 proceeding went to the "very essence" of a consent decree that had been entered by the district court. *Id.* at 864-65. The Second Circuit held that "[g]iven the exceptional circumstances presented," the district court could exercise its "residual jurisdictional authority" under the All Writs Act to protect the integrity of the consent decree and prevent the "risk of inconsistent decrees from the two courts." *Id.* at 865 ("The implementation of that decree takes precedence over petitioners' desire to have the [case] . . . litigated in state court."). "The *Yonkers* holding has been cited as the exception not the rule." *N.Y. State Corr. Officers & Police*, 911 F. Supp. 2d at 132 (citing *Coastal Commc'ns*, 658 F. Supp. 2d at 459; *Kelly v. City of Mount Vernon*, 344 F. Supp. 2d 395, 407 (S.D.N.Y. 2004)).

Similarly, in *Westchester Day Sch. v. Village of Mamaroneck*, 417 F. Supp. 2d 477, 559-60 (S.D.N.Y. 2006), *aff'd*, 504 F.3d 338 (2007), the court exercised jurisdiction over plaintiff's

Article 78 claim under the All Writs Act and the court's supplemental jurisdiction. Plaintiff's Article 78 claim challenged the zoning board's denial of plaintiff's application for a special use permit to construct a classroom building on its campus. 417 F. Supp. 2d at 483. A prior order of the district court required the zoning board to continue plaintiff's application to the special permit hearing stage and afford plaintiff a fair hearing, which was not done. *Id.* at 559. Acknowledging that "the federal courts should not become zoning boards of appeal," the court nonetheless found that it was "incumbent upon the Court to address the legality of the [zoning board's] denial of the Application in order to protect the integrity of the [court's prior order] and to achieve the ends of justice entrusted to it." *Id.* at 559-60 (citations and internal quotation marks omitted). In addition, the court found that it had "become intimately familiar with the merits of this case during the last four years" noting that "[a] full record ha[d] been developed after significant discovery that addresse[d] all the circumstances surrounding the denial of the special permit modification." *Id.* at 561.

None of the considerations present in *Yonkers Racing* or *Westchester Day* is present here. There is no prior Order of the Court in jeopardy of being violated should the Article 78 proceeding proceed in state court. Moreover, the Court is not "intimately familiar" with the Southampton ZBA proceedings, and no full record has been developed regarding those proceedings after significant discovery.

Plaintiffs' reliance on *Cartagena v. City of New York*, 345 F. Supp. 2d 414, 426 (S.D.N.Y. 2004) is similarly misplaced. In that case, the district court exercised jurisdiction over plaintiff's Article 78 claims only after the defendants, having acknowledged the "unusual circumstances of th[is] case," withdrew their jurisdictional objections and consented. Here, Defendants vehemently oppose the exercise of supplemental jurisdiction.

Lastly, Plaintiffs rely on *Fortress Bible Church v. Feiner*, 694 F.3d 208, 224 (2d Cir. 2012), where the Second Circuit affirmed the trial court's judgment for plaintiffs -- a church and its pastor -- on their RLUIPA, Free Exercise, Equal Protection, and Article 78 claims against a town, the town board, and its board members. *Id.* at 212. In *Fortress Bible*, plaintiffs claimed that the town's denial of the church's land use and zoning applications -- to build a worship facility and school on land that the church owned -- violated their rights. *Id.* After a twenty-six day bench trial, the district court found, *inter alia*, that the defendants' denial of plaintiffs' application violated RLUIPA in that the denial substantially burdened plaintiffs' religious exercise and defendants failed to demonstrate a compelling governmental interest warranting that denial. *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 508-09 (S.D.N.Y. 2010). With regard to plaintiffs' Article 78 claims, the court noted that it had already found, in evaluating plaintiffs' RLUIPA claims, that the Town's purported concerns were unsupported. *Id.* at 519. "Without implying that the standards under RLUIPA and Article 78 are the same," the court found "it unnecessary to repeat . . . its analysis regarding the Town's purported concerns." *Id.* Instead, the court held that "[f]or the same reasons that those concerns do not constitute compelling governmental interests under RLUIPA, neither are they supported by substantial evidence under New York law." *Id.* at 519-20. On appeal, the Second Circuit affirmed, finding that the record contained ample evidence to support the district court's finding that the town's adverse determination was not supported by substantial evidence. 694 F.3d at 224.

In *Fortress Bible*, neither the district court nor the Second Circuit discussed the issue of whether an Article 78 proceeding could be maintained in federal court. Rather, the fact that the underlying state court proceeding was an Article 78 proceeding appeared incidental to both courts' findings. In fact, by the time it reached the Second Circuit, the case had been extensively

litigated in the district court for over seven years.  Here, by contrast, this action was filed just slightly over one year ago, weeks after the ZBA's decision in August 2013 denying Plaintiffs' claims.  Moreover, despite the Second Circuit's decision in *Fortress Bible* affirming the district court's exercise of supplemental jurisdiction, the Court notes that the Second Circuit has reached a contrary result in at least one other case (other than *Carver*).  In *McNamara v. Kaye*, 360 F. App'x 177, 177 (2d Cir. 2009), the Second Circuit, in an unreported decision, affirmed a district court's decision to decline to hear an Article 78 claim and dismissed the claim for lack of subject matter jurisdiction.  In so doing, the Second Circuit cited with approval two district court cases -- *Morningside*, 432 F. Supp. 2d at 346 and *Cartagena*, 257 F. Supp. 2d at 710 -- which had similarly dismissed Article 78 claims.  Thus, in the Court's view, while *Fortress Bible* may stand for the proposition that the Court *can* exercise supplemental jurisdiction over a party's Article 78 claim in appropriate circumstances, it does not mean that the Court must do so.  *See, e.g.*, *Coastal*, 658 F. Supp. 2d at 459 (noting that "[o]nly two cases have been advanced where a federal court has exercised jurisdiction over an Article 78 claim" and that "[i]n any event, where supplemental jurisdiction is claimed, district courts still may decline to exercise it pursuant to 28 U.S.C. § 1367(c)").  In fact, as noted above, "federal courts have, with rare exception, denied supplemental jurisdiction to Article 78 claims."  *Id.* at 460.  The Court does not find such exceptional circumstances present here which would warrant a departure from that practice.

Finally, the Court notes that it is cognizant of the fact that by not addressing Plaintiffs' Article 78 claim, the resolution of Plaintiffs' application will be delayed.  However, because the Court believes that the important issues posed by this case should be first addressed by the New York state courts, the Court declines to exercise supplemental jurisdiction over Plaintiffs' Article 78 claim pursuant to 28 U.S.C. § 1367(c)(4).  Thus, this claim is dismissed, without prejudice.

## V.     CONCLUSION

Based on the foregoing considerations and analysis, Defendants' motion to dismiss the

Complaint is GRANTED to the extent that Plaintiffs' Sixth Cause of Action is dismissed,

without prejudice, and this action is STAYED pending determination of the Article 78

proceeding in New York state court.[7]

**SO ORDERED.**

Dated:  Central Islip, New York
        September 24, 2014

                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge

---

[7]     Because the Court is staying the remainder of this action, the Court does not find it necessary to address Defendants' other arguments at this juncture.